UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ROBERT S. SCHMIDT,

        Plaintiff,

                                Case No. 20-cv-1915-pp

   v.

WATERTRONICS, LLC,

        Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 10) AND DISMISSING CASE**

---

On December 28, 2020, the plaintiff filed a complaint alleging discrimination (Count One) and retaliation (Count Two) under the Americans with Disabilities Act (ADA), as amended, 42 U.S.C. §12101, *et seq.* Dkt. No. 1. The defendant has filed a motion for summary judgment. Dkt. No. 10. The court will grant the motion.

**I.    Facts**[1]

    A.   <u>The Plaintiff's Condition</u>

The plaintiff testified at his deposition that in 1999, he was diagnosed with Protein S blood deficiency.[2] Dkt. No. 17-1 at 20, Tr. Page 57 lines 9-17. He

---

[1] The only forms of evidence the defendant has provided are the plaintiff's discovery responses and some excerpts of deposition transcripts. Dkt. Nos. 13-1 through 13-6; Dkt. Nos. 20-1 and 20-2. The only forms of evidence the plaintiff has provided are his own declaration and excerpts of deposition transcripts. Dkt. Nos. 16, 17-1 through 17-6.

[2] According to the Cleveland Clinic, "Protein S Deficiency is a rare clotting problem that you can inherit from your parents. Many people with this

1

testified that after he had several blood clots, his doctor sent him to the cancer center in West Bend, Wisconsin, where the condition was diagnosed. Id. at Tr. Page 57 lines 18-25; 21, Tr. Page 58 lines 1-2.

B.     The Plaintiff's Hiring

On April 2, 2019, the plaintiff was hired and began working for the defendant as a welder. Dkt. No. 15 at ¶1. During the onboarding process, the plaintiff completed a document which Human Resources director Pamela Bemis called an "affirmative action form," dkt. no. 13-3 at 10, Tr. Page 33 lines 18-23, and which is titled "Self-Identification of Disability Form," dkt. no. 13-1 at 1. The plaintiff marked the box on the form next to the words "NO, I DON'T HAVE A DISABILITY." Id. The plaintiff testified at his deposition that while filling out the form, he told "the HR lady" about his blood disease and asked, "do I put down that I have a disability or not." Dkt. No. 17-1 at 1, Tr. Page 15 lines 3-12. The plaintiff testified that "she said she did not see that necessary to put down," so the plaintiff marked the box for no disability. Id., lines 12-14. The plaintiff testified that he told the "HR lady" that he had a blood disease, that he had had numerous blood clots and that he'd gone to the doctor frequently for the issue. Id., lines 15-19.

C.     The Chronology of the Plaintiff's Time with the Defendant

1.     *April 3-5 and 8-9*

The plaintiff worked for the defendant for six days: April 3, 2019 through April 5, 2019 and April 8, 2019 through April 9, 2019. Dkt. No. 15 at ¶3.

_____

deficiency don't get a dangerous blood clot, but others can have deep vein thrombosis or pulmonary embolism." https://my.clevelandclinic.org/health/diseases/21877-protein-s-deficiency.

2. *Wednesday, April 10, 2019*

The plaintiff did not report for work for the next three days—April 10, 2019 through April 12, 2019—due to a reported illness. Id. at ¶4. On the first of those three days—April 10—the plaintiff texted a coworker that he was having trouble with his leg and would not be coming to work that day. Id. at ¶5. In his response to the defendant's discovery requests, the plaintiff provided an undated text to someone named "Mike." Dkt. No. 13-1 at 3. The text contained a photo; part of the photo is cut off, but it shows what appears to be a man's lower leg with several red, splotchy marks of various sizes on the skin above the ankle and below the calf. Id. The text reads:

> I'm sending you this picture because I'm not coming into work today which is fucked up excuse my language I don't have Todd's number I looked in the water Tronics handbook I couldn't find a phone number so I want to make sure you tell him right away this morning I can barely walk on my leg I'm gonna go see the doctor today make sure I don't have a blood clot in my leg I'm quite upset that's not like me to miss work especially just after starting if Todd wants to call tell him to call I'll let you know what's up later today[.]

Id.

On the afternoon of April 10, the plaintiff texted his supervisor, Todd Katcha, and told him that he did not have a blood clot and would be coming into work the following day, April 11. Dkt. No. 15 at ¶6. The text read,

> Hey Todd this is Robert Schmidt I just got back from getting my blood work done I'll be in tomorrow I don't have a blood clot the swelling in my leg in the discoloration has actually gone away compared to how it was when I woke up last night early this morning I would've texted you directly I did not have your info I guess I accidentally deleted your voice messages which got rid of your phone number so I texted Mike because I knew the message would get to you right away this morning I will see you tomorrow I greatly apologize for missing work in my second week that is not like me at all I'll talk to you tomorrow. I was in more pain than I usually am dealing with and my leg was hard as

3

a rock and swollen this morning that is why I missed work again I apologize see you tomorrow[.]

Dkt. No. 13-1 at 4.

### 3. *Thursday, April 11, 2019*

On the morning of April 11, the plaintiff texted Katcha and told him that he was still having trouble with his leg and would miss work because he was going back to the doctor. Dkt. No. 15 at ¶7. This text, which appears to have been sent around 5:00 a.m., read,

> Todd I'm pretty sure I'm going to have to go back to the doctor I don't know what's going on with my leg but I definitely won't be able to stand all day the swelling and pain subsided but Yet in the middle of the night it's seem to get worse. I'm quite angry right now because I'm sure you're disappointed and I can deal with a lot of pain but something isn't right with my leg[.]

Dkt. No. 13-1 at 5.

The plaintiff texted Katcha again that evening and said that he would be not be in the following day because he would be getting an ultrasound of his leg. Dkt. No. 15 at ¶8. The plaintiff indicated that if the ultrasound results were okay, he would be back at work on Monday, April 15. Id. This text read,

> I just tried to call you I left a voicemail message I will not be at work tomorrow I was just to see the doctor I do have to do an ultrasound tomorrow it Hass [sic] to get scheduled I will let you know tomorrow of the results I already have paperwork from the doctors office if I don't have a blood clot I can work Saturday to make up for this week and I will be at work at work [sic] Monday I would prefer to work Saturday if you want me to work as long as I don't have a blood clot I'll trying call you again tomorrow[.]

Dkt. No. 13-1 at 6.[3]

_____

[3] The same night, the plaintiff accidentally sent Katcha an unrelated text intended for someone else. Dkt. No. 13-1 at 5-6. It is not relevant to the case.

4

4.      *Friday, April 12, 2019*

At his deposition, the plaintiff testified that he gave "them" a letter from his doctor's office that "probably would have been the prior Friday, not the 16th." Dkt. No. 13-6 at 17, Tr. Page 37 lines 6-12. Counsel responded, "So you believe there's an April 12th letter from your doctor?," and the plaintiff responded, "Yeah, there's another letter." Id. at lines 13-15. See also Dkt. No. 17-1 at 6, Tr. Page 41 lines 4-12. Defense counsel asked that that letter be turned over to the defense. Dkt. No. 13-6 at 7, Tr. Page 37 at lines 16-18. The record contains no letter dated April 12, 2019.

5.      *Monday, April 15, 2019*

The plaintiff did not report to work on April 15. Dkt. No. 15 at ¶9. Around 4:30 a.m. that day, the plaintiff texted Katcha saying he would not be at work that day due to his son having been injured in a car accident overnight. Dkt. No. 13-1 at 7. The text read,

> My son was in an accident coming home from the bucks game last night not a major accident but he broke his leg and has a concussion I'm at the hospital with him now his car was obviously wrecked pretty well so once he's released this afternoon or this morning I'll be taking them home[.]

Id. Katcha responded, "Robert, please make sure you bring in a slip from the hospital showing you were there. Thanks[.]" Id.

6.      *Tuesday, April 16, 2019*

At 5:18 a.m., Katcha sent the plaintiff a text stating, "Robert.. we need a doctor's excuse for the 3 days you were off, Wednesday, Thursday and Friday. Plus a slip stating you are ok to return to work from your doctor. Thank you." Dkt. No. 13-1 at 7. The plaintiff responded, "I understand Todd I will specifically

5

have them put everything down in writing they open <u>at 8 o'clock</u> I will try and be there right <u>at 8 o'clock</u> I should be to work before nine[.]" <u>Id.</u> at 8. At 8:12 a.m., the plaintiff sent another text to Katcha:

> Hey Todd I'm just leaving the clinic now they will not be able to have my letter done until after 1 o'clock today they have to get the letter together they have to have it signed and then I have to pick it up they understand what you need to have in the letter but the letter will not be done <u>until 1 PM</u> I left you a voice message if you need to call me please call me so I can explain everything but it looks like I will not be returning to work until tomorrow since I cannot get this letter until after <u>1 PM</u>[.]

<u>Id.</u> at 9. At 10:49 a.m., Katcha responded, "That's fine. Bring it in the morning and that will be great," to which the plaintiff said, "OK I'll see you tomorrow morning." <u>Id.</u> at 10. The plaintiff sent another text that evening stating,

> I wanted you to know when I went into pick up my letter it was the same letter that I gave you they made a copy of that and put that in the envelope by mistake the doctor was gone so I have to go get the letter tomorrow morning As soon as they open and then come to work[.]

<u>Id.</u> at 10.

While the texts do not reflect it, the plaintiff went to work on April 16. Dkt. No. 19 at ¶4. It appears that he went in after the 5:18 a.m. text exchange with Katcha and before the 8:12 text he sent Katcha indicating that he would not be able to get a note until after 1:00 p.m. The plaintiff testified at his deposition that went in at either ten minutes to six or ten minutes to seven in the morning. Dkt. No. 13-6 at 15, Tr. Page 35 lines 13-16. It appears that he provided someone (likely Katcha) with a letter dated April 11, 2019, which the plaintiff indicates showed that he was under a doctor's care for the days he'd missed work and that he was now cleared to return. Dkt. No. 19 at ¶4; Dkt. No. 13-6 at 16, Tr. Page 36 lines 8-12.

6

The defendants provided the note, which is dated April 11, 2019. Dkt. No. 13-1 at 15. It is signed by Yoshiaki Akiya, MD of Family Medicine, Hartford Health Center, and states, "Robert S Schmidt was seen in clinic today. I am sending him to imaging tomorrow to see if he has additional blood clots. If he does not have new ones, he might go back to work on 4/13/19." Id.

The plaintiff filed a verified declaration in opposition to the summary judgment motion. Dkt. No. 16. The declaration avers that after the plaintiff came to work on April 16, Katcha sent him home because the note "was allegedly insufficient." Id. at ¶2. The plaintiff testified at his deposition that he worked for about twenty minutes, and then Katcha told him that the letter he had provided was not good enough and that the plaintiff needed a letter stating specifically why the plaintiff missed each day—the 10th, 11th and 12th. Dkt. No. 13-6 at 19, Tr. Page 39 lines 4-11. In his declaration, the plaintiff avers that he disagreed with Katcha and said that because he was under his doctor's care and did not have a clot, the note released him to do work after April 13. Dkt. No. 16 at ¶3. The plaintiff averred that he complained that what Katcha was doing was not fair "because [Katcha] was mad that [the plaintiff] had taken time off due to [his] medical condition." Id. The plaintiff testified at his deposition that he had to go home and stay off work because he could not get another doctor's note before 11:00 a.m. Dkt. No. 13-6 at 16, Tr. Page 36 lines 13-18.

### 7. *Wednesday, April 17, 2019*

The plaintiff did not work on April 17. Dkt. No. 15 at ¶16; Dkt. No. 13-1 at 2. The defendant asserts that there was no contact between the plaintiff and the defendant until 9:44 p.m. that day. Dkt. No. 15 at ¶16. In *his* declaration, the

7

plaintiff avers that he missed a call from Katcha that morning asking about the status of the plaintiff's doctor's note. Dkt. No. 16 at ¶4. He avers that he called Katcha back later that morning, that Katcha explained what he needed from the plaintiff with respect to the doctor's note and told the plaintiff not to return to work until the following day. Id. at ¶5. The plaintiff also stated that during their conversation Katcha told him not to come in until the afternoon of April 18 to speak with Justin Reese, the plant manager. Id. See also, Dkt. No. 15 at ¶16.

At 9:44 that evening, the plaintiff sent Katcha a text stating,

> I have the release to come back to work I missed your call today I apologize for not getting back to you I will not be into work first thing in the morning I will come and talk to you and Justin I was quite upset the other day when I was sent home from work so I would like us to clear the air so I will come in in the afternoon tomorrow[.]

Dkt. No. 13-1 at 10-11.

### 8. *Thursday, April 18, 2019*

At 10:53 a.m. on April 18, Katcha texted the plaintiff stating, "Justin is on vacation today and Friday so we can meet on Monday 4/22/19 at 9:00 am. Do not return to work until our meeting. Thank you." Dkt. No. 13-1 at 11. See also, Dkt. No. 16 at ¶7.

### 9. *Monday, April 22, 2019*

The plaintiff texted Katcha on April 22 at 7:52 a.m., saying, "I will be in tomorrow at 9 AM I found that there was not really a need to text you over the weekend as I had set an appointment up that can't be rescheduled So as important as I know this meeting is Justin wasn't going to be until this morning so please tell him I will be in tomorrow at nine[.]" Dkt. No. 13-1 at 11. In his

declaration, the plaintiff avers that before 9:00 a.m. that morning, he received a voicemail from Justin Reese stating,

> Robert, Justin[] Reese from Watertronics . . ., just wanted to let you know that I think we are, we're just done with the job opportunity, we are terminating your employment, give me a call or give Todd a call tomorrow morning to pick up your toolbox, due to the lack of communication, I know Todd has been in communication with you, and trying to get you back in to work and you're not picking up your phone when we give you a call, going right to voicemail, so give me a call back, please make arrangements, good luck, I'll go and get you a letter inside the mail to send to you, thank you very much.

Dkt. No. 16 at ¶8.

> 10.    *Tuesday, April 23, 2019*

On April 23, Justin Reese wrote a letter to the plaintiff stating that the plaintiff was being terminated. Dkt. No. 13-2 at 11. The relevant portion of the letter states,

> Robert:
>
> As of the date of this letter you have been absent from your position with [the defendant] since April 9, 2019. Because your absence was not approved and we have not received adequate communications from you, we have determined that you have voluntarily resigned by abandoning your position.
>
> In compliance with our job abandonment policy, your termination of employment is effective as of today (4/23/2019).
>
> . . . .

Id.

> D.    The Defendant's Policies

At the time of the plaintiff's employment and termination, the defendant had a policy regarding absences from work:

> Absence from work for three (3) consecutive days without notifying your supervisor or any other manager will be considered a voluntary resignation. If an absence is for an illness, a written doctor's excuse must be furnished after 3 days of absence. When returning to work

9

after three (3) days of absence . . . a doctor's "Fitness for Duty" certificate is required immediately on the first day before commencing work.

Dkt. No. 15 at ¶21; Dkt. No. 13-2 at 6.

E.    The "Release" Letter

In his responses to the defendant's request for production of documents, the plaintiff provided the a letter dated April 16, 2019 and signed by Dr. Akiya at the Family Medicine, Hartford Health Center:

Robert S. Schmidt is a patient at Froedtert and the Medical College of Wisconsin and was seen on 4/11/19. Please excuse Robert from work on 4/10/19, 4/11/19 and 4/12/19. Due to his testing being normal he is released to return to work on 4/16/19. Please contact with any questions at . . . .

Dkt. No. 13-1 at 16. The plaintiff asserts that he never was given the opportunity to provide this letter to the defendant. Dkt. No. 15 at ¶20.

F.    The Plaintiff's Other Assertions

1.    *Katcha decided whether disabled employees needed accommodation*

Todd Katcha was the fabrication supervisor; he testified at his deposition that he never had had a disabled employee. Dkt. No. 17-3 at 1, Tr. Page 14 lines 16-17. The plaintiff asserts in his additional proposed findings of fact that it usually was left to Katcha to determine whether an accommodation was needed for a disabled employee, dkt. no. 15 at 12, ¶20, but the evidence he cites (Katcha's deposition, Dkt. No. 17-3, page 14-17, and Bemis's deposition, Dkt. No. 17-4 pages 7-9, 13) does not support this assertion. The same is true of the plaintiff's assertion that Katcha "is not sure if he could identify" a person with a disability. Dkt. No. 15 at ¶21 (citing Katcha's deposition, Dkt. No. 17-3 pages 14-17, 19).

10

2. *The defendant was on notice that the plaintiff had a disability that required an accommodation*

The plaintiff asserts that the defendants were "on notice" that he had a disability that required an accommodation. Dkt. No. 15 at 9, ¶3. Aside from his own declaration and deposition testimony, the plaintiff supports this assertion with a reference to "Backus Dep. Pages 9-11 and 20." Id. One of the exhibits the plaintiff filed in opposition was a document that is referenced as "Exhibit H— Deposition Testimony of Michael Backus." Dkt. No. 17-2. This document consists of eight pages from a deposition transcript—transcript pages 9-11, 14-15, 17-18 and 20. It appears that "Michael Backus" is the co-worker "Mike" to whom the plaintiff sent the text the first morning he did not come to work. Backus testified that he remembered that the plaintiff did not show up for work because he had "something with his legs, something wrong with his legs." Id. at 1-2, Tr. Page 9 at line 25, Tr. Page 10 at line 1. He identified the text he'd received from the plaintiff with the photo of the plaintiff's leg, and said that he understood the plaintiff was asking him to "let Todd know and show him the picture;" Backus said he did exactly as the plaintiff had asked. Id. at 2-3, Tr. Page 10 lines 10-25; Tr. Page 11 lines 1-3.

3. *Katcha told others that he was trying to get rid of the plaintiff*

The plaintiff testified at his deposition that his wo-worker "Mike" had told the plaintiff that Katcha had told "Mike" and others that "they were going to get rid" of the plaintiff for not having a doctor's excuse for his son's accident. Dkt. No. 17-1 at 14-16 (specifically, 16, Tr. Page 51 lines 13-19). Katcha testified at his deposition that he does not remember Human Resources or Reese talking to him about the decision to terminate the plaintiff. Dkt. No. 17-3 at 13, Tr. Page

11

32 lines 17-23. Nothing in Michael Backus' deposition testimony supports the plaintiff's contention; when asked if he heard Katcha say anything about the plaintiff after the first day of the plaintiff's absence, Backus responded, "No. No. I mean . . . other than the fact that he was just not here. I mean, that's it. I mean, as far as related to any detail, no." Dkt. No. 17-2 at 4, Tr. Page 14 lines 12-18.

        4.    *The defendant did not terminate other employees who had medically-related absences*

Finally, the plaintiff asserts that "[d]efendants would not normally terminate employment if the employee was keeping regular contact and needed more time to get a doctor's note." Dkt. No. 15 at 11, ¶19. He cites to the Backus deposition in support of this assert. The testimony he references appears on pages 6-8 of that document:

> A.:    No, I'm going to say no to that. I mean, they wouldn't—based on my employment here and the history of working with people that have been sick, there—our company—this company won't terminate somebody after three days. As long as they're calling in sick and keeping everybody in the loop. They'll say, hey, I gotta go to the doctor and, you know, I got issues. But they won't terminate you for being sick for three days. I've been sick for three days. I still work here.
>
> Q.:    Is it possible that [the plaintiff] missed a whole week before he was let go?
>
> A.:    I know he was gone for more than three days. Specifically how many days I can't remember. And as—no, I cannot remember how many specific days he was gone.
>
> Q.:    In your time working for [the defendant], do you recall anybody missing a week of work because of their own medical condition and then returning?
>
> A.:    Yes. Yes.
>
> Q.:    That's happened multiple times?

12

A.: Yeah. People have heart issues and other health issues, they need surgeries. Yeah.

Q.: Okay. Do you recall it being a scenario where they missed two weeks and then returned to work?

A.: Six months.

Q.: Okay. And without identifying that person unless it was you, do you know what—why they missed six months?

A.: Yeah. Open heart surgery.

Q.: Okay. And so, again, not to belabor this; but, for instance, at one month has someone been out and been allowed to return to work?

A.: I would say yes. I mean, I don't know any specifically that they've been out exactly one month and then come back to work. Only the people that are closely working with me do—would I remember that I cannot.

Dkt. No. 17-2 at 6-8, Tr. Page 17 lines 14-25; Tr. Page 18 lines 1-25; Tr. Page 19 line 1.

The plaintiff also cited page 28 of Katcha's deposition in support of this assertion. The following exchange appears to be what the plaintiff is referring to:

A.: If he wanted to return to work, he could have got his—his excuse from his doctor and brought it in.

Q.: Right, but let's say, for instance, the doctor's office is closed that day. Is he given another day to go in and get the doctor's note?

A.: Well, yes, of course.

Q.: Okay. How about two days?

A.: I'd imagine that probably two days would've been fine.

Q.: Okay. At some point, there's a limit, though, if he's not coming in with a note?

13

A.:   Well, yes, when—when the employee tells me he's going to come in with an excuse and then doesn't come in, call, or—or text or anything.

Q.:   Okay. Okay. So at what—at what point—well, let me ask you this. If—if an employee is a no-call/no-show for one day, are they automatically terminate?

A.:   No.

Q.:   If they're a no-call/no-show for two days, are they let go?

A.:   Probably not.

Q.:   Okay. After three days?

A.:   After three days without a doctor's excuse, yes.

Dkt. No. 17-3 at 9-10, Tr. Page 28 lines 1-25; Tr. Page 29 line 1.

Finally, the plaintiff cited HR director Pamela Bemis's deposition in support of this assertion. The following exchanges occurred at Bemis's deposition:

[A.:]   It's just—basically, I would say it's an—an absence and letting the employer know of their absence.

Q.:   Okay. So if an employee, for instance, missed two days without notifying anybody but then notified somebody on the third day, that would be allowed?

A.:   Yes.

Q.:   And so they wouldn't be punished for missing those two days?

A.:   Correct. It's a three-day window.

Q.:   Okay. And I—just to clarify here, if there's a no-call/no-show and that happens two days in a row, at that point, [the defendant] will not terminate or discipline that employee until they—and let me back that up.

So if there's a no-call/no-show for two days in a row, that employee is not terminated at that point, correct?

A.:   Correct.

14

Q.: Okay. They'd be given the opportunity for a third day to call in and provide a reason for their absence?

A.: Correct.

Q.: If the fourth day comes and they have not called in or provided a reason for their absence, would they then be terminated?

A.: Yes.

Q.: Are there times when an employee calls in and provides a reason but it's not considered a good enough reason?

A.: I don't know of an instance of that.

Q.: Okay. What else is needed from the employee then to return to work without any discipline for the time missed?

A.: They would need something from their doctor showing they were able to return to work or they were able to return without a restriction.

* * * * *

Q.: Okay. How long would you give an employee to obtain a doctor's certification?

A.: I would say a reasonable amount would—would be five days. I would think that that would be something that could be done in a short amount of time.

Dkt. No. 17-4 at 8-9, 11, Tr. Page 18 lines 1-25; Tr. Page 19 line 1-13; Tr. Page 21 lines 20-25.

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute

15

over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

16

## III. The Parties Arguments

A. <u>The Defendant's Brief</u>

The defendant argues that the plaintiff has provided insufficient evidence to support his claims for discrimination and retaliation. Dkt. No. 11 at 6-10.

Regarding the discrimination claim, the defendant argues that "there is no evidence that anyone at [the defendant] considered the Plaintiff to be disabled and none of the text messages sent by the Plaintiff referenced any such disability." <u>Id.</u> at 6. The defendant also asserts that it never was informed of any need for accommodations for the plaintiff's alleged disability. <u>Id.</u> at 7. It says that it tried to obtain necessary information from the plaintiff regarding his absences but was unsuccessful. <u>Id.</u> at 8. It says that the plaintiff provided one letter dated April 11, 2019, from Dr. Akiya, which stated that the plaintiff had been seen at the clinic that day and would be going in for imaging the next, and that the plaintiff could return to work on April 13 if he did not have any blood clots. <u>Id.</u> at 7. The defendant asserts that the plaintiff "never provided any excuse for the three days he missed for illness and never provided any return to work authorization from his doctor." <u>Id.</u> The defendant contends that the plaintiff cannot show that the defendant caused any breakdown in the communication process that preceded his termination. <u>Id.</u> at 8 (citing <u>Beck v. Univ. of Wis. Bd. of Regents</u>, 75 F.3d 1130 (7th Cir. 1996)).

The defendant argues that the plaintiff did not disclose a disability when he signed his employment documents. <u>Id.</u> at 8. For the purposes of the motion, the defendant does not dispute that the plaintiff mentioned to the defendant that

17

he had a blood disease, but it argues that the plaintiff still would have needed to advise the defendant that he needed an accommodation. Id.

As to the retaliation claim, and for the purposes of this motion only, the plaintiff does not dispute the plaintiff's assertion that he "had a disability or was perceived as such." Id. at 9. It reiterates, though, that he never requested an accommodation for any disability. Id. The defendant says that the plaintiff notified the defendant only that he needed three days off for medical reasons but that the defendant's policies and procedures required the plaintiff to provide a note from his doctor regarding the three days he was absent and a return to work certification. Id. The defendant acknowledges the plaintiff's allegations that he complained to management and human resources that he was being treated unfairly due to his disability and requested accommodations, but it argues that the plaintiff offers no evidence in support of such assertions. Id. The defendant says that the plaintiff never engaged in any protected activity because he never mentioned or complained about any lack of accommodation by the defendant. Id.

B.     The Plaintiff's Brief in Opposition

Regarding his discrimination claim, the plaintiff argues that he could have been given the opportunity to provide a doctor's note, but that he was ordered not to return to work even after he'd indicated that he had such a note. Dkt. No. 14 at 6. He asserts that "other employees had enjoyed more leeway." Id. The plaintiff argues that "a jury could find from the evidence that need for a change in schedules were not uncommon and other non-disabled welders had taken months off, or would be given multiple days off in order to obtain medical

certifications." Id. (citing 42 U.S.C. §12111(9)(B)). The plaintiff accuses the defendant of actively preventing him from providing his medical certification, asserting that Katcha refused to "receive" it and said the plaintiff was responsible for the days that he'd missed because he was ordered not to return to work and suggesting that the plaintiff was not communicating with the defendant when he was. Id. at 6-7 (citing Lawler v. Peoria Sch. Dist. No. 150, 837 F.3d 779, 787 (7th Cir. 2016); Spurling v. C&M Fine Pack, Inc., 739 F.3d 1055, 1061-62 (7th Cir. 2014)).

The plaintiff says that the defendant refused to let him come back to work "under the guise that he did not have appropriate medical certifications." Id. at 7. He says there has been no "contention" that giving him an extra two days to provide the medical certifications posed an undue hardship on the defendant. Id. He asserts that some of his absence was outside of his control because Katcha had told him not to report to work. Id. He says that the defendant "was not planning on terminating [his] employment on the morning of April 17, 2019, despite whatever absences had occurred beforehand." Id.

The plaintiff also argues that the defendants were on notice of his disability. Id. at 8. He says that the defendant "received a picture of his swollen leg" and was told "repeatedly that he had a blood condition that results in blood clots and that he could not stand on his leg." Id.

The plaintiff argues that absent his disability, he would not have been fired. Id. He says that absent the disability, he would not have missed three consecutive days of work and been forced to obtain a doctor's excuse and clearance to return. Id. The plaintiff says that the defendant "was put on notice"

19

that the plaintiff's absence was due to his disability. Id. at 8-9. He says that the defendant "denied Plaintiff's initial letter" and sent him home, then did not permit him to come back immediately even when he had a compliant letter. Id. at 9. The plaintiff asserts that the defendant's claims that he was terminated for his absence and failure to communicate were pretextual. Id. He argues that the explanations by Katcha and Reese for his termination do not square with the evidence in the record and asserts that Katcha was intent on terminating him "either after he took time off for his disability, or after he complained of being unfairly sent home for not having an appropriate doctor's note." Id. The plaintiff maintains that he "clearly obtained the April 16, 2019 letter to return to work," and argues that it should be up to the trier of fact to determine why he would have obtained that document if he didn't intend to return to work. Id. at 10.

As to the retaliation claim, the plaintiff argues that he was retaliated against for engaging in protected activities. Id. at 10 (citing Rodrigo v. Carle Found. Hosp., 879 F.3d 236, 243 (7th Cir. 2018)). He says that "[w]hile other employees who request time off are given plenty of leeway to take the time they need or obtain medical certifications," his request for "three days off for his disability was not met with the same flexibility." Id. at 11. The plaintiff says that [w]hether it was his use of time off or his complaints that he was not being treated fairly because of his medical condition when he was sent home on April 16, 2019, as soon as he obtained an updated medical certification (the next day) he was told not to report and was released form his position before the date set for his return." Id.

C.    The Defendant's Reply Brief

The defendant begins by questioning the plaintiff's account of the communication timeline, specifically his April 17, 2019 conversations with Katcha. Dkt. No. 18 at 1. The defendant argues that the plaintiff's assertion that he spoke with Katcha over the phone that morning is contradicted by his text to Katcha later that evening. Id. at 1-2. The defendant similarly questions the plaintiff's assertion that his employment was terminated over the weekend. Id. at 2. The defendant recounts the plaintiff's conduct over the days following his initial absence and argues that his "conduct showed a distinct lack of interest in returning to work with the Defendant." Id. at 3.

The defendant also argues that the plaintiff has not offered any facts supporting his allegation that the defendant failed to accommodate his disability. Id. It contends that the plaintiff was told not to come in on only one day—April 19. Id. The defendant argues that even if it had notice, "the ADA does not require an employer to assume that an employee with a disability suffers from a limitation and it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom." Id. at 3-4 (citing Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894 (7th Cir. 2000)).

The defendant argues that the plaintiff never informed it of any limitations because he had no limitations, and his doctor did not place any limitations on his return to work. Id. at 4. The defendant points out that none of the documentation the plaintiff did provide about his April 2019 illness indicates whether it was related to his blood condition and that he was never diagnosed

21

with blood clots. Id. The defendant says that the text messages indicate that the plaintiff simply "felt he could just decide when and if he wanted to show up for work," and argues that this type of conduct is not protected by the ADA. Id. (citing Waggoner v. Olin Corp., 169 F.3d 481 (1999)).

As for the plaintiff's claim that if not for his disability he would not have missed work, the defendant asserts that this argument is irrelevant because "the plaintiff admits that the defendant had a legitimate business reason for terminating his employment for failing to communicate and failing to come to work." Id. As to the plaintiff's claim of pretext, the defendant asserts that the plaintiff has "absolutely no facts to support his allegations that the defendant wanted to terminate him because of his disability . . . ." Id. at 5. The defendant challenges the plaintiff's assertion that Katcha wanted to terminate him for taking time off, arguing that this assertion is disproven by Katcha's texts to the plaintiff focusing on the need for him to provide a doctor's note. Id.

Finally, as to the retaliation claim, the defendant reiterates that the plaintiff "never acted in any protected activity and offers no connection to his termination other than his implausible arguments that he was told not to report for work and was terminated before he was scheduled to return to work." Id. The defendant says that the plaintiff has provided neither direct nor circumstantial evidence of a retaliatory motive. Id. at 6 (citing Taylor-Novotny v. Health Alliance Med. Plans, Inc., 772 F.3d 478 (7th Cir. 2014)). It says that the plaintiff has provided no evidence that he was terminated for any reason but his absence. Id.

# IV. Analysis

## A. Discrimination

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability in regard to job application procedures [and] hiring.'" Roberts v. City of Chi., 817 F.3d 561, 565 (7th Cir. 2016) (quoting 42 U.S.C. §12112(a)). The Seventh Circuit has explained that

> [t]he ADA forbids certain types of disability discrimination: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA then defines "discriminate against a qualified individual on the basis of disability" to include disparate treatment *and* failure to accommodate: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S.C. § 12112(b)(5)(A).

Scheidler v. Indiana, 914 F.3d 535, 541 (7th Cir. 2019).

The Scheidler court explained that a *disparate treatment* claim requires a plaintiff to prove that he was disabled, that he was qualified to perform essential functions with or without reasonable accommodation and that his disability was the "but for" cause of any adverse employment action. Id. (citing Monroe v. Ind. Dep't of Transp., 871 F.3d 495, 503-04 (7th Cir. 207); Felix v. Wis. Dep't of Transp., 828 F.3d 560, 568 (7th Cir. 2016)). A *failure to accommodate* claim, on the other hand, requires a plaintiff to prove that he was a qualified individual with a disability, that the defendant was aware of his disability and that the defendant failed to reasonably accommodate his disability. Id. (citing E.E.O.C. v. AutoZone, 809 F.3d 916, 919 (7th Cir. 2016); Brumfield v. City of Chi., 735 F.3d 619, 630 (7th Cir. 2013)).

23

The plaintiff begins his opposition argument by discussing the law governing failure-to-accommodate claims. Dkt. No. 14 at 5. He discusses the elements of a failure-to-accommodate claim, id. at 6, and Seventh Circuit cases addressing failure-to-accommodate claims, id. at 7. But four pages into his discussion, the plaintiff's arguments begin to sound like disparate treatment arguments (although he does not use that phrase). He asserts that the "sole question that must be answered here is whether [he] would have kept his job had he not been disabled or used accommodations and everything else had been the same," id. at 8—one of the elements of a disparate treatment claim. The balance of his discrimination discussion appears to focus on disparate treatment argument (albeit not designated as such), not failure to accommodate. Id. at 8-12.

Because it is not clear whether the plaintiff is claiming that the defendant subjected him to disparate treatment as a result of his disability as well as that the defendant failed to make reasonable accommodation for his disability, the court will analyze both claims, starting with the one the plaintiff identified specifically—failure to accommodate.

1. *Failure to Accommodate*

"'The ADA requires employers to make reasonable accommodations for a qualified individual with a disability.'" McAllister v. Innovation Ventures, LLC, 983 F.3d 963, 967 (7th Cir. 2020) (quoting Taylor-Novotny, 772 F.3d at 493). "A claim for failure to accommodate under the ADA . . . requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his

disability; and (3) defendant failed to accommodate his disability reasonably."
Scheidler, 914 F.3d at 541 (emphasis omitted).

### a.  Qualified Individual with a Disability

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102. A qualified individual is "a person who, with or without reasonable accommodation, can perform the essential functions of [his] job." McAllister, 983 F.3d at 967.

The plaintiff testified in his deposition that he has Protein S deficiency, a condition that can and has forced him to miss work due to difficulty standing. For the purposes of summary judgment, the defendant does not dispute that this condition constitutes a disability.

The evidence shows that the plaintiff performed his job for six days before running into health issues, and for the purposes of summary judgment the defendant does not dispute that the plaintiff was a qualified individual.

There is no genuine dispute of material fact that the plaintiff has established the first element of his failure-to-accommodate claim—he is a qualified individual with a disability.

### b.  The Defendant's Awareness of the Disability

The defendant argues that it "was never informed of the need for any accommodations" for the plaintiff's alleged disability. Dkt. No. 11 at 7. This assertion does not address the second element of a failure-to-accommodate claim: whether the defendant was aware of the plaintiff's disability.

25

The plaintiff says that the defendant knew of his disability because he sent a co-worker a photo of his "swollen" leg. The evidence indicates that Michael Backus received a photo of the plaintiff's lower leg with red, splotchy marks on it; Backus testified that he understood the plaintiff to be asking him to show the photo to Katcha and that he did what the plaintiff asked. This evidence does not prove that the defendant was aware that the plaintiff had a *disability*. It proves only that the defendant was aware that the plaintiff was suffering from some issue with his leg; even the plaintiff said in his text to Backus that he did not know what was going on with the leg. The plaintiff asserts that his doctor's April 11, 2019 note—which the plaintiff provided when he came to work April 16—put the defendant on notice that he had a disability because it mentioned blood clots. This argument assumes—as the plaintiff does throughout his brief, proposed statements of fact and responses to the defendant's statements of fact—that Katcha or Backus or anyone else would assume from the fact that the doctor was requiring imaging to make sure there were "no additional blood clots" that the plaintiff suffered from a clotting disorder or disease that would constitute a disability. A person can suffer a blood clot—even multiple blood clots—and not be disabled.

The only evidence in the record showing that the plaintiff made the defendant aware of his disability is his unchallenged deposition testimony. The plaintiff testified that during on-boarding, he told Bemis about his blood disease, that he told her that the disease made it hard for him to stand and that he told her that he needed to go to the doctor frequently. He testified that Bemis told him it was not necessary to list the condition as a disability in his paperwork,

26

which he is why he didn't. The defendant has not directly disputed this testimony. While there is no evidence that Bemis shared this information with anyone else, this testimony constitutes *some* record evidence creating a genuine dispute of material fact as to whether the defendant was aware of the plaintiff's alleged disability.

### c. Failure to Accommodate

"Generally, an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation." Guzman v. Brown Cty., 884 F.3d 633, 642 (7th Cir. 2018) (citing Jovanovic, 201 F.3d at 899); Preddie v. Bartholomew Consol. Sch. Corp., 799 F3d 806, 813 (7th Cir. 2015) ("First, we note that a plaintiff typically must request an accommodation for his disability in order to claim that he was improperly *denied* an accommodation under the ADA.").

The plaintiff states in his proposed additional facts that the defendant had notice that the plaintiff's disability required an accommodation, dkt. no. 15 at 9, ¶3, but none of the evidence he cites to supports this assertion. He cites to his own deposition, but he never testified during his deposition that he had requested an accommodation. See dkt. no. 17-1 at 1-2, 19-22. Nor did Katcha, dkt. no. 17-3, nor did Bemis, dkt. no. 17-4. The plaintiff did not request an accommodation in his texts to Katcha, dkt. no. 13-1 at 4-12, and did not aver in his declaration filed in opposition to the summary judgment motion that he did so, dkt. no. 16. There is no evidence in the record that the plaintiff asked anyone for an accommodation for his clotting disorder.

27

Tacitly acknowledging this, the plaintiff argues that "the Seventh Circuit has stressed that [n]o hard and fast rule will suffice": instead, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." Dkt. No. 14 at 7 (quoting <u>Beck</u>, 75 F.3d at 1135). The plaintiff lifts this quote out of context. When it stated that "[n]o hard and fast rule will suffice," the Seventh Circuit was discussing who bears responsibility when an employee and an employer try to engage in an interactive process to determine what a reasonable accommodate would be and that process breaks down. <u>Beck</u>, 75 F.3d at 1135 ("Neither the ADA nor the regulations assign responsibility for when the interactive process fails. No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."). Nothing in <u>Beck</u> obligates an employer to provide an accommodation when the employee has not requested one.

To the contrary, the Seventh Circuit has held that even when an employer might be aware of an employee's disability, that employee still must request an accommodation before he can argue that the employer denied it. In <u>Preddie</u>, 799 F.3d at 813, the court stated, "Although it is fair to assume that the [defendant] was aware of [the plaintiff's] diabetic condition, there is no evidence to suggest that [the plaintiff] ever requested an accommodation for this condition, other than intermittently requesting days off . . . Without such a request, we conclude that [the plaintiff's] failure to accommodate claim under the ADA does not survive summary judgment."

Because, even viewing the evidence in the light most favorable to the plaintiff, there is no evidence that the plaintiff requested an accommodation for his blood disorder, there is no genuine dispute of fact over whether the plaintiff requested a reasonable accommodation. Because he did not, the court will grant summary judgment in favor of the defendant on the failure-to-accommodate claim.

2. *Disparate Treatment*

"A claim for disparate treatment based on disability under the ADA . . . requires proof (1) plaintiff was disabled; (2) plaintiff was qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of adverse employment action." <u>Scheidler</u>, 914 F.3d at 541. As discussed above, there is no genuine dispute that the plaintiff is disabled and that he was qualified to perform the job for which the defendant hired him. The court will focus its analysis on whether there is a genuine dispute as to whether the plaintiff's disability was the "but for" cause of his termination.

> Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts as we answer the only question that matters: when looking at the evidence as a whole, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because [the court is] evaluating this question in the context of [the defendant's] motion for summary judgment, [its] task is to look at the facts in the light most favorable to [the plaintiff] and determine whether [the defendant] is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 . . . (1986).

<u>Brooks v. Avancez</u>, 39 F.4th 424, 433 (7th Cir. 2022).

29

Prior to August 2016, courts approached employment discrimination cases by analyzing whether a plaintiff could prove these elements by either a "direct" method or an "indirect" method. "Admissions of culpability and smoking-gun evidence were assigned to the 'direct' method . . ., while suspicious circumstances that might allow an inference of discrimination were assigned to the 'indirect' method." Ortiz, 834 F.3d at 763.

In August 2016, however, the Seventh Circuit observed that "[t]he use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years," listing cases in which various members of that court had "disapproved both the multiple methods and the search for mosaics." Id. at 764 (citations omitted). The court said, "The time has come to jettison these diversions and refocus analysis on the substantive legal issue." Id. The court stated that the relevant legal standard

> is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself— or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

Id. at 765. The Ortiz court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." Id.

The Ortiz court observed that "[t]he burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), sometimes is

referred to as an 'indirect' means of proving employment discrimination." Id. at 766. It clarified that its decision did not concern McDonnell Douglas "or any other burden-shifting framework, no matter what it is called as a shorthand." Id. The court explained that its decision addressed only the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently;" it explained that "all evidence belongs in a single pile and must be evaluated as a whole," and found that conclusion consistent with McDonnell Douglas. Id.

The Seventh Circuit since has noted numerous times that the McDonnell Douglas burden-shifting framework "can be a helpful way to evaluate evidence of discriminatory intent in employment discrimination claims." Brooks, 39 F.4th at 434.

> [The plaintiff] can make a prima facie case of discrimination by demonstrating that (1) [he] is disabled under the ADA . . .; (2) [he] performed [his] job to [his] employer's legitimate expectations; (3) [he] suffered an adverse employment action; and (4) one or more similarly situated individuals outside [his] protected class received better treatment. . . . *Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (ADA). If [the plaintiff] successfully establishes a prima facie case of discrimination using these steps, then [the defendant] must produce evidence demonstrating that it took the actions [the plaintiff] complains of based on legitimate, nondiscriminatory reasons. If successful, it falls to [the plaintiff] to demonstrate that [the defendant's] reason is pretextual—that is, an attempt to mask a discriminatory reason with a legitimate excuse. . . . *Hooper*, 804 F.3d at 853 (ADA).

Id.

For a plaintiff to prove the third element of a disparate treatment claim and survive summary judgment, he "must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse

action . . . ." <u>Monroe</u>, 871 F.3d at 503 (citing <u>Serwatka v. Rockwell Automation,</u>

<u>Inc.</u>, 591 F.3d 957, 962 (7th Cir. 2010)).

> To show that disability discrimination was the "but for" reason for the termination, a plaintiff can use either direct or circumstantial evidence. Direct evidence would be an admission that the defendant fired the plaintiff on the basis of his disability. Circumstantial evidence may include
>
>> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

<u>Id.</u> at 504 (quoting <u>Bunn v. Khoury Enter., Inc.</u>, 753 F.3d 676, 684 (7th Cir.

2014)).

The plaintiff has not alleged that there is direct evidence of discrimination;

he has not alleged that the defendant has admitted to discrimination, nor has he

alleged the existence of "smoking gun" evidence. That means that he must use

circumstantial evidence to prove his disparate treatment claim. The plaintiff

mentions the <u>McDonnell Douglas</u> burden-shifting framework in his brief, noting

that it is familiar and that a plaintiff may use it where it is applicable. Dkt. No.

14 at 8. He does not make the effort to fit the evidence into that framework or

argue that he has stated a *prima facie* case under the framework. Nonetheless,

the court considers whether he has done so.

To state a *prima facie* case of discrimination under the <u>McDonnell Douglas</u>

framework, the plaintiff first must demonstrate that he is disabled under the

ADA. Because the defendant has not contested this for the purposes of summary

judgment, the court concludes that the plaintiff has demonstrated that fact.

32

Second, the plaintiff must demonstrate that he performed his job to his employer's legitimate expectations. Neither party presented any evidence on this factor. Third, the plaintiff must demonstrate that he suffered an adverse employment action. The plaintiff has done that—the evidence shows that he was terminated. Finally, he must demonstrate that one or more similarly situated individuals outside his protected class systematically received better treatment than he did.

The plaintiff asserts in his opposition brief that "similarly situated non-disabled employees" were allowed to "take more time off, or to have up to five days to get a doctor's note that was compliant with Defendant's attendance policy." Dkt. No. 14 at 2. He says that "other employees had enjoyed more leeway." Id. at 6. He says that other employees "who request time off are given plenty of leeway to take the time they need or obtain medical certifications." Id. at 11. These general, broad assertions do not demonstrate, and the record does not contain evidence showing, that "similarly situated individuals" outside his protected class "systematically" received better treatment than he did.

Backus testified that he knew of individuals who'd been out of work for medical reasons for much longer periods than the plaintiff and had not been fired. That likely is true, but his testimony does not demonstrate that those individuals were "similarly situated" to the plaintiff, or that they were outside of the plaintiff's protected class (disabled). There is no evidence of who those individuals were, whether they were disabled, whether they provided doctor's notes or medical certifications or when. Katcha testified that an individual who was out for three days and did not provide a doctor's note would be terminated.

33

He also testified that he never had had an employee who was disabled, but this does not prove that *none* of the defendant's employees who took time off for medical leave were disabled (as the plaintiff implies). Bemis testified that she thought it would be "reasonable" to give someone five days to obtain a doctor's note,[4] but did not testify that there were non-disabled employees who'd been kept on despite being out for an extended period without providing a doctor's note or medical certification. There is nothing in the record to support the plaintiff's claim that non-disabled individuals who were similarly situated to him systematically were treated better.

The plaintiff has not established a *prima facie* case of discrimination under the <u>McDonnell Douglas</u> framework. Even if he had, the defendant has produced evidence that it terminated the plaintiff based on legitimate, non-discriminatory reasons. The plaintiff does not dispute that the defendant had a policy requiring employees who were absent because of illness to provide a written doctor's excuse after three days of absence, or that it had a policy requiring that when the employee returned after three days, the employee was required to provide a doctor's "Fitness for Duty" certificate before he or she could return to work. The plaintiff asserts that the policy doesn't specify that the doctor's note must cover all three days of absence, and he insists that the April 11 note from Dr. Akiya

---

[4] Arguably, the defendant gave the plaintiff five days. He missed work on Wednesday, Thursday and Friday (April 10, 11 and 12) and the following Monday (April 15). On April 16, he provided a note for one of those days—April 11. But he did not provide a note for April 10—the first day he missed work. Although the plaintiff testified that he'd provided another note dated April 12, there is no evidence supporting that statement.

that he provided on April 16 cleared him to return to work.[5] These arguments do not refute the defendant's asserted legitimate, non-discriminatory reason for the termination. And it appears that the plaintiff never provided the proof Katcha requested, demonstrating that he'd been absent on April 15 due to his son's accident.

Under <u>McDonnell Douglas</u>, when a defendant presents a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the reason was pretextual. The closest the plaintiff comes to identifying one of the forms of circumstantial evidence the Seventh Circuit has recognized that might demonstrate "but for" causation is suspicious timing. The plaintiff testified that on Tuesday, April 16, when Katcha sent him home because the April 11 doctor's note was not sufficient, the plaintiff got upset and complained to Katcha that he was not being treated fairly. He testified—and the texts corroborate—that the next night (at 9:44 p.m. on Wednesday, April 17)—he advised Katcha that he had the medical release. The plaintiff says—and the texts verify—that the following morning (Thursday, April 18), Katcha told him not to return to work until Monday the 22nd. He subsequently was terminated.

This could suggest suspicious timing. But "[t]he problem is that suspicious timing alone is rarely enough by itself." <u>Tibbs v. Admin. Office of the</u>

_____

[5] The plaintiff's argument that the April 11 note from his doctor cleared him to return to work is frivolous. The notice indicated that the doctor was going to send the plaintiff for imaging on April 12 to see if he had additional blood clots and that if he did not, the plaintiff "might go back to work on 4/13/19," a Saturday. The letter conditioned the plaintiff's return to work on the imaging showing no additional blood clots; there is no evidence in the record that the plaintiff received clearance that he had no additional blood clots.

35

Ill. Courts, 860 F.3d 502, 505 (7th Cir. 2017). In the retaliation context, the Seventh Circuit has held that "[a] plaintiff must ordinarily present other evidence that the employer's explanation for the adverse action was pretext for retaliation." Id. (citations omitted). The plaintiff has presented nothing other than circumstantial evidence of suspicious timing in support of his claim that the defendant's reason for terminating him was pretextual. His testimony that "Mike" told him that Katcha was trying to get rid of him is not supported by Backus's testimony and, as the defendant points out, is hearsay. See, e.g., Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment.") (citations omitted).

Finally, the Seventh Circuit has warned that courts must not "shoehorn the evidence into" particular frameworks and must focus on "the sole question that matters: Whether a reasonable juror could conclude that [the plaintiff] would have kept his job if [he did not have the proscribed factor], and everything else had remained the same." Rowlands v. United Parcel Service-Fort Wayne, 901 F.3d 792, 801 (7th Cir. 2018) (quoting Ortiz, 834 F.3d at 764). Viewing the evidence in the light most favorable to the plaintiff without regard to the McDonnell Douglas framework, the court concludes that a reasonable juror could not conclude that the plaintiff's blood disorder was the "but for" cause of his being terminated.

The evidence shows that, at best, the plaintiff advised one employee of the defendant (HR director Pamela Bemis) that he suffered from a blood disorder that made it hard for him to stand and that required him to go to the doctor

36

frequently. It shows that the plaintiff worked six days, then missed three days for an "illness;" the record contains no evidence of what that illness was. It shows that over those three days, the plaintiff notified Backus and Katcha that he was having trouble with his leg and that he was not sure what was wrong but that he was seeing doctors to make sure he did not have a blood clot. It shows that the plaintiff sent Backus a photo of his leg with visible, splotchy red marks on it. It shows that the plaintiff missed work again on a fourth day and told Katcha it was due to his son having been in an accident. It shows that Katcha asked the plaintiff for proof both of the plaintiff's illness and of his son's hospitalization after the accident. There is no evidence in the record that the plaintiff ever provided proof of the latter. As to the former, the record shows that on April 16th, the plaintiff provided a letter from his doctor indicating that he had been at the clinic on April 11 (the second day he was off) and that the doctor planned to send him for imaging on April 12. There is no evidence that the plaintiff provided proof of why he was out on April 10, whether he had imaging done on April 12 or why he was out April 12. There is no dispute that the defendant's policy required an employee returning to work after a three-day illness-related absence to provide a medical clearance; there is no evidence that the plaintiff provided that clearance on April 16 or April 17. And there is no evidence that non-disabled employees were absent due to illness for three days or more without providing a doctor's excuse or medical clearance and nonetheless were not terminated.

The court will grant summary judgment in favor of the defendant on the plaintiff's disparate impact claim.

B.     Retaliation

"The ADA prohibits retaliating against individuals (qualified or not) who have engaged in activities protected by the ADA, such as filing a Charge of Discrimination with the EEOC or requesting reasonable accommodations." Rowlands, 901 F.3d at 798 (citing Rodrigo, 879 F.3d at 241). To prove retaliation, the plaintiff must "demonstrate that [he] engaged in protected activity, that [he] suffered an adverse action, and that there is a causal connection between the two." Id. at 801 (citing Rodrigo, 879 F.3d at 243). The plaintiff may use direct or circumstantial evidence to prove those elements. Id. at 801-02 (citing Monroe, 871 F.3d at 503). Again, the plaintiff may point to evidence such as suspicious timing, ambiguous statements or behavior toward other disabled employees, evidence that similarly-situated non-disabled people systematically received better treatment and evidence of pretext. Id. at 802.

There is no dispute that the plaintiff suffered an adverse employment action; the court must determine whether there are genuine disputes of fact regarding whether he engaged in a protected activity and his protected activity was the "but for" cause of the adverse action.

1.     *Protected Activity*

To prove that he engaged in a protected activity, the plaintiff must show that he "asserted his rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to his disability." Preddie, 799 F.3d at 814-15. A claim of discrimination may include informal complaints. Davis v. Time Warner Cable of Se. Wis., L.P., 651 F3d 664, 674 (7th Cir. 2011).

There is no evidence that the plaintiff requested an accommodation. There is no evidence that before he was terminated, he filed a complaint with the EEOC or other agency. That leaves the plaintiff's claim that he complained that he was being treated unfairly when he was told that the April 11, 2019 letter from his doctor was insufficient.

The plaintiff averred in his declaration that on April 16, when Katcha sent him home because the April 11 doctor's note was not sufficient, the plaintiff "disagreed with [Katcha] because [the note] demonstrated [he] was under doctor's care and, that unless [he] had a blood clot, [he] would be released to work after April 13, 2019, and complained that what [Katcha] was doing was unfair because he was mad that [the plaintiff] had taken time off due to [his] medical condition." Dkt. No. 16 at ¶3. The is the only evidence approaching protected activity, and it does not make clear what, exactly, the plaintiff said to Katcha. But viewing that evidence in the light most favorable to the plaintiff, the court concludes that the plaintiff has presented evidence that he made an "informal complaint" that constituted protected activity. See Casna v. City of Loves Park, 574 F.3d 420, 426-27 (7th Cir. 2009) (holding that a hearing-impaired plaintiff who responded to her supervisor's request about how she could work if she could not hear by asking, "Aren't you being discriminatory?" had made an "informal complaint" that constituted protected activity).

   2. *Causal Connection*

As the court already has determined, however, the only evidence the plaintiff has presented of a causal link between his complaint to Katcha and his firing is temporal proximity—suspicious timing. The suspicious timing alone is

not enough. The record contains no other evidence that the defendant's reason for terminating the plaintiff—his failure to abide by the company policy requiring him to provide a doctor's excuse for his absence and medical clearance on the day he returned after a three-day, illness-related absence—was pretextual.

## V.     Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 10.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 30th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**